### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 22-cr-205-2 (TJK)** |
| v. | : | |
| | : | |
| PATRICK KING, | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Patrick King to 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 restitution.

### I.      Introduction

Defendant Patrick King, a 32-year-old warehouse stocker, and his codefendant, Brian Jones,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

Defendant King pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because: (1) prior to January

---

[1] Separately charged in this case, Jones is also scheduled to be sentenced on May 9, 2023.

[2] The approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

6, King spoke on Facebook about his plan to participate in a riot; (2) when entering the Capitol, King pushed past a Capitol Police officer who was physically trying to keep people out of the building; (3) once inside, he tried to provoke the crowd and encouraged other rioters to travel further into the Capitol; (4) King smoked marijuana while in the building, filmed himself doing so, then shared that video via social media; (5) he said in Facebook conversations after January 6 that he "was part of rushing the police," and "went to punk congress"; and (6) King has never expressed remorse for his actions that day.

The Court must also consider that King's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of King's crime support a sentence of 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 restitution in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 34 (Statement of Offense), at 1-4.

### King's Role in the January 6, 2021 Attack on the Capitol

Brian Jones and Patrick King, two friends from the state of Washington, flew together to Washington D.C. on January 5, 2021, to attend then-President Trump's "Stop the Steal" Rally.

Before the events of January 6, King used Facebook to converse with his friends about his plans for the day, including saying that he would "riot" if he had to:

| King: | We had like an hour but now we about to take flight for dc |
| Facebook Friend AL: | Oh shit thats cool man. Y'all my heros! |

Facebook Friend AL:          You guys gonna riot?
King:                        If we have too

After the rally at the Ellipse on January 6, Jones and King marched to U.S. Capitol grounds. On their way, Jones and King were separated and King continued alone.

King first entered the Capitol building through the East Rotunda Doors at 2:46 p.m. He joined a group of rioters flooding past Capitol Police officers trying to secure that entrance. While his friend, Jones, waited inside, King and others physically pushed past those two officers who were standing in the doorway, facing down the crowd, and doing everything in their power to stem the flow of rioters into the building. (**Figure 1**, Screenshot from **Sentencing Exhibit 1** at 0:16.)



*Figure 1, Screenshot from **Sentencing Exhibit 1** at 0:16: Jones looks on as King and others bully their way past Capitol Police officers trying to secure the building.*

Once inside, King reunited with his friend Jones and the two walked further into the building. Jones appears to congratulate King on his entry and the two appear to rejoice at their successful entry into the U.S. Capitol. (**Figure 2**.)



*Figure 2: Reunited, Jones and King revel in their breach of the Capitol building.*

Together, the two proceeded back into the Rotunda, where Jones had been before but King had not. King pushed forward ahead of Jones, pumping his fists overhead and shouting toward the ceiling. He paced back and forth through the room, continuing to apparently shout and chant, all while holding his cellphone aloft. After a brief, animated conversation with Jones, King headed for one of the doors leading out of the Rotunda and further into the building, with Jones following closely behind. (**Figure 3**).



*Figure 3: Jones and King in the Rotunda.*

4

King proceeded, without Jones, to the area inside the Senate Wing Doors, the site of the very first breach into the Capitol building. By 2:49 p.m., when he arrived in this area, a crush of rioters had stagnated in the hallway. King goaded the crowd on, waving a hand above his head back toward the interior of the building, encouraging the crowd to move further inside. (**Figure 4**).



***Figure 4****: King beckons the crowd further into the Capitol.*

Here, while shoulder to shoulder with other rioters, King smoked marijuana—he brings a smoking object to his lips, inhales, and turns his glowing cellphone so the filming camera points toward his face. (**Figure 5**).



*Figure 5: King smokes marijuana in the Capitol while filming himself.*

King later used Facebook to send a short video clip that depicts him smoking marijuana near the Senate Wing Doors. (**Figure 6,** Screenshot from **Sentencing Exhibit 2** at 0:02.).



*Figure 6*, Screenshot from **Sentencing Exhibit 2** at 0:02*: Screenshot from a video clip King later sent via Facebook that depicts him smoking marijuana near the Senate Wing Doors.*

Eventually, King left this area and headed back the way he came. He walked through the Crypt, into the Hall of Columns, and past growing groups of police officers who were beginning to mass inside the building. He followed a file of rioters through an exit and finally left the Capitol building at 3:02 p.m., sixteen minutes after entering.

*Social Media Posts*

After the attack on the Capitol, King bragged to others on Facebook about his exploits on January 6. On the day of January 6, King discussed his breach of the Capitol in a conversation with a Facebook friend, saying he "was part of rushing the police" and "went to punk congress."

| | |
|---|---|
| Facebook Friend JN: | Dod you guys really storm the capital? |
| King: | Yeahh i got in |
| King: | Smoked weed n shit |
| Facebook Friend JN: | No way? |
| King: | I got the video |
| Facebook Friend JN: | Thats nuts |
| King: | I was part of rushing the riot police |
| Facebook Friend JN: | What the hell provoked that? |
| King: | We went to punk congress |
| King: | Let them we know we ain't fuckin around no more |
| King: | Cause they were gonna vote |
| King: | So we banged right out side the room let them now they need to do the right thing |
| Facebook Friend JN: | Think it made a difference? |
| King: | It better |

Later on January 6, he also bragged to another friend saying that he had "crazy videos" and that he "got tear gased":

| | |
|---|---|
| Facebook Friend SK: | Are you in the capital?? |
| King: | *(Message unsent)* |
| Facebook Friend SK: | Omfg |
| Facebook Friend SK: | I'm dead |
| King: | I got crazy videos |
| King: | Got tear gased |

At nearly the same time that King was bragging about rushing the police and being tear gassed, he and Jones were also using Google to search for information about the criminality of entering the Capitol. They searched phrases including: "Is it illegal to go into the Capitol"; "US Capitol facial recognition"; "Unlawful entry charge"; "Law definition of breach"; "DC police release photos of people who broke into Capitol"; and others. (*See* King PSR, ECF 39, ⁋ 20.)

A day later, on January 7, King minimized his participation in the riot, distinguishing himself from other rioters who explored more secure rooms or caused violence or vandalism, and said that he "gave a cop a hug":

| | |
|---|---|
| Facebook Friend MH: | But was it even legal for you to be inside at all during that time |
| King: | I think there going after the people who explored in the more secure rooms and chambers, or caused violence and vandalism |
| King: | So thats why I'm hoping for a slap on the wrest |
| Facebook Friend MH: | I'm hoping for nothing |
| King: | Me too |
| King: | Wish I would've had my mask on |
| Facebook Friend MH: | Mask do come in clutch for some things |
| King: | Right |
| King: | But yeah I literally went in then, went down a hall way yelled for a little bit then left went downstairs and was directed how to leave and gave a cop a hug and left, looked for jones for a bit then went to the hotel |

Two days after the attack, on January 8, 2021, he again attempted to minimize his conduct in the building while simultaneously acknowledging that he had trespassed and used marijuana inside. In a separate conversation with another Facebook friend, King, who had in fact pushed his way into the Capitol past the police, spread false information about January 6, saying, "cops literally let us in":

| | |
|---|---|
| King: | We didn't do anything but enter it |
| King: | We didn't destroy,vandalize or steal anything |
| King: | Just the fact we were inside is trespass |
| King: | Federal or even capital trespass |

| King: | So my worry is takin one puff of weed and being inside the capital |
| King: | Being inside is trespass |
| Facebook Friend AL: | You smoked weed up in that mf? |
| King: | But thats were it get iffy cause cops literally let us in |
| King: | Yeah I took a puff in the capital |

*Defendant's Statements*

After King's arrest, FBI agents transported him to his initial court appearance from the local police station where he surrendered. During that drive, King made unprompted remarks falsely claiming that government agencies caused the events of January 6, saying that "three-letter agencies like the CIA and you guys [the FBI] were the ones that instigated it" and "we were just checking it out and not the ones who hurt anybody."

King interviewed with the U.S. Probation office in anticipation of the Presentencing Report in this case. Unlike his codefendant Jones, King did not discuss his conduct on January 6 during the interview and expressed no remorse for his actions that day. (ECF 39, ⁋ 29).

King also did not submit to a post-plea interview with the U.S. Attorney's Office and the FBI, although he was obligated to do so by his plea agreement.

*The Charges and Plea Agreement*

On March 15, 2022, the United States charged King by criminal complaint with: Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). On March 23, 2022, King self-surrendered in the Western District of Washington. On June 6, 2022, the United States charged King by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On February 17, 2023,

pursuant to a plea agreement, King pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

King now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. King must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 60 days of incarceration, 36 months of probation, 60 of hours community service, and $500 restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing King's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like King, the absence

of violent or destructive acts is not a mitigating factor. Had King engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in King's case is his anticipation of violence on January 6 and professed willingness to participate in it. When a Facebook friend asked him whether he planned to "riot," King answered affirmatively, saying that he would "if we have to."

Further, King's actions in gaining entry to the Capitol and while inside make him more than a mere "tourist," as other January 6 defendants have claimed to be. When entering, he pushed aggressively past a Capitol Police officer who was standing in a doorway trying to use his body to secure the entrance. While inside the Capitol, King goaded other rioters to move further into the building. King also not only chose to smoke marijuana while in the Capitol building, but did so in a braggadocious manner: he filmed himself smoking, then shared a clip of that video on the internet.

King's aggressive rhetoric did not stop after January 6, either. In the days following his participation in the attack on the Capitol, King bragged on Facebook that he was "part of rushing the police" and "went to punk congress." Tellingly, King has never expressed remorse for actions on that day.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of King

As set forth in the PSR, King has incurred a series of misdemeanor criminal convictions. In addition to multiple convictions King incurred as a minor, since King reached the age of majority he has been convicted of: (1) Reckless Driving in 2012; (2) Disorderly Conduct in 2012; and (3) Operating While Intoxicated in 2019. (ECF 39, ¶¶ 31-35.) King received short terms of

imprisonment for these offenses, which did not deter him from engaging in criminal conduct on January 6, further warranting a significant term of imprisonment in this case.

King also lied to the Probation Department during his interview with them. King said that he last used marijuana at the age of 16, (ECF 39, ⁋ 52), but that claim is obviously untrue given the evidence in this case. CCTV footage and King's own cellphone video show him smoking marijuana in the Capitol on January 6, and in a Facebook conversation he admitted, "I took a puff in the capital."

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

12

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

King's words and conduct before, during, and after January 6 demonstrate the need for specific deterrence in this case. Before the riot he said in a Facebook conversation that he would participate in a riot, and once inside the Capitol he acted offensively and aggressively. King has not shown remorse for his actions on January 6. Instead, he said in Facebook conversations that

he "was part of rushing the police" and "went to punk congress," while also searching the internet

for information related to his January 6 crimes. His lie to the Probation Department that he had not

used marijuana since the age of 16 further shows his contempt for the rule of law and increases the

chance that he will commit a crime in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles

in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This

Court must sentence King based on his own conduct and relevant characteristics, but should give

substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

King has pleaded guilty to Count Four of the Information, charging him with Parading,

Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This

offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply,

U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases,

15

even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory

range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For instance, in *United States v. Jeffrey Register*, 21-CR-349 (TJK), this Court sentenced the defendant to 75 days of incarceration. Like King, Register pled guilty to a single count of violating 40 U.S.C. § 5104(e)(2)(G). Many factors in Register's case bear similarities to this one. Register encouraged other rioters to enter the Capitol by waving them forward, similar to King's beckoning toward other members of the crowd while he was in the area near the Senate Wing Doors. Register also lied about his criminal conduct, denying to the FBI that he entered the Capitol, as King did when he told the Probation department that he had not used marijuana since he was

17

16. And Register's criminal history, while modest, included two jail sentences. Similarly, King has a history of misdemeanor offenses.

*United States v. John Getsinger,* 21-CR-607 (EGS), presents another apt comparison. In that case, Judge Sullivan sentenced the defendant, who pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), to 60 days of incarceration and 36 month of probation. As Getsinger entered the Capitol building through the Rotunda doors, he joined a large mob of other rioters who overpowered the police to gain entry—conduct similar to King's pushing past a Capitol Police officer in the same location. Getsinger also appeared to smoke marijuana while in the Capitol, then bragged online that he "smoked a fatty inside the capital." Like King, Getsinger expressed no remorse for his actions at the Capitol for almost a year, and actively promoted false information on social media, claiming that law enforcement assisted Antifa and that he was pushed into the Capitol. Unlike King however, Getsinger spent a longer period inside the building—39 minutes, as opposed to King's 16.

*United States v. Blas Santillan*, 22-CR-032 (TJK), also contains factual similarities to this case and Judge Pan sentenced the defendant to 45 days of incarceration and 36 months of probation. In that case, the defendant pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Like King, who encouraged other rioters to venture further into the building, Santillan also provoked the crowd, exhorting others to storm through doors to breach the Capitol. Once inside the building, Santillan paraded through the Rotunda, shouting and raising his arms in celebration of the riot—conduct strikingly similar to King's. And, like King, who has never shown regret for his actions on January 6, Santillan did not express remorse.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id*. at 1095.[4]

---

[4] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these

factors, the government recommends that this Court sentence Defendant Patrick King to 60 days

of incarceration, 36 months of probation, 60 hours of community service, and $500 restitution.

Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on his liberty as a consequence of his behavior, while recognizing his

acceptance of responsibility for his crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By: */s/ Eric Boylan*_____
      ERIC BOYLAN
      Assistant United States Attorney
      Texas Bar Number 24105519
      United States Attorney's Office
      610 D Street, N.W.
      Washington, D.C.  20001
      Telephone: (202) 815-8608
      Email: eric.boylan@usdoj.gov

</div>

---

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.